604 So.2d 1086 (1992)
Leroy DEROUEN
v.
Hudson L. MURRAY.
No. 89-CA-1089.
Supreme Court of Mississippi.
July 8, 1992.
*1088 Thomas D. Berry, Jr., Gulfport, for appellant.
James C. Simpson, Jr., Simpson & Simpson, Gulfport, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the Court:

I.
This action by an unhappy corporate shareholder challenges the propriety of actions of a co-shareholder and fellow officer and director who, after sale of the corporation's principal business operations, thereafter formed a new corporation which acquired the first corporation's assets. The offended shareholder sues individually the said-to-be unfaithful officer and then implicitly asserts derivatively a claim of the original corporation.
The Chancery Court conducted a plenary trial on the merits and dismissed the complaint. Insofar as plaintiff personally claims of and from the defendant, we affirm. On the derivative claims, we reverse and remand.

II.
H & D Seafood Corporation is a domestic corporation organized and existing under the laws of this state and having its principal place of business in Gulfport, Mississippi. At all times relevant hereto  and particularly prior to December of 1982  Hudson L. Murray and Leroy Derouen were and are each fifty percent shareholders in H & D. Murray was and is the president of the corporation, while Derouen has served as secretary-treasurer. Both Murray and Derouen live on the Mississippi Gulf Coast. Murray has but a sixth grade education, while Derouen is a graduate of Mississippi State University in business administration.
Prior to December of 1982, H & D operated an unloading dock and a retail seafood and ice business in the Gulfport area. The corporation operated out of premises situated on the Small Craft Harbor at Gulfport, premises owned by the State and leased through the Mississippi State Port Authority and the Mississippi A & I Board.
On December 9, 1982, H & D sold its business and all assets incident thereto to Lee P. Gutierrez, Jr., of Gulfport. As a part of the purchase price, Gutierrez gave to H & D his notes payable annually at $50,000.00 plus interest beginning December 1, 1983, and continuing for the next three years thereafter. To secure payment of these notes, Gutierrez granted H & D a security interest in all of the business assets it had just purchased. In particular, H & D assigned its leasehold on the Small Craft Harbor premises to Gutierrez, who in turn gave H & D a deed of trust thereon as further security for the first three years of the installment payments.
Following the sale, H & D ceased active business operations. The corporation has continued in existence, insofar as the record reflects, its principal assets consisting of the Gutierrez notes and the security therefor. It appears the corporation has a continuing liability with Farmers Home Administration incident to the purchase of an ice plant formerly a part of the business. H & D remains liable to Farmers Home, although the principal obligation on the indebtedness was assumed by Gutierrez and subsequent purchasers.
Derouen has had no part in the dock, seafood and ice business since December of 1982. Murray, however, went to work for new owner Gutierrez as a salaried employee and essentially managed the business. Matters proceeded apace in this posture for the next eighteen months or so. Gutierrez sought to expand the business and made "some" improvements on the property but, in the end, "did not [sink] a lot of money into it."
In the Summer of 1984, Gutierrez found himself in what he described as a "financial bind." "I had other businesses that weren't doing well, and I just needed to divest myself of this business." About this time, Hudson L. Murray, together with his nephew, James S. Murray, formed a new corporation, M & M Seafood, Inc.
*1089 On July 3, 1984, Gutierrez sold the entire business to M & M for an aggregate consideration of $266,587.25. Gutierrez conveyed all assets of the business to M & M, including a further assignment of the lease on the Small Craft Harbor premises. Among the considerations M & M gave was its assumption of Gutierrez's outstanding obligations on the notes held by H & D. It appears from his testimony Gutierrez thought he had been relieved of any obligations on the H & D notes, though nothing before us suggests H & D gave any such release. At some time not made clear in the record, James S. Murray sold his interest to his uncle, Hudson L. Murray, so that the latter Murray became the sole shareholder in M & M Seafood. The business expanded further over the next year.
In the Summer of 1985, a man named David Mills caused the formation of a corporation known as Seafood and Ice, Inc. As fate would have it, by this point in time, Derouen had gone to work for Mills in an unrelated operation in Cameron, Louisiana, although Derouen knew nothing of what was about to transpire. In late August of 1985, M & M Seafood sold the business and all assets incident thereto to Seafood and Ice, Inc., for an aggregate consideration of $437,250.00. Seafood and Ice assumed all obligations on the H & D notes, although again nothing before us suggests H & D released M & M (or Gutierrez).
It is not entirely clear what Gutierrez paid on the notes to H & D, or when, but we do know that in December of 1983, in disregard of the corporate form, Derouen received $25,000.00 plus interest, a de facto dividend, if you will.[1] In December of 1984, Derouen again received $25,000.00, his fifty percent "share" of the payment due, plus interest. Of note, by this time the business had been sold to M & M, and Derouen knew he was being paid by M & M.
Things did not go so well the following year, for when Derouen approached Murray about "his" December, 1985, payment, he learned Murray was no longer in the business. Murray told Derouen he should look to Seafood and Ice and David Mills for his money. By this time, Derouen and Mills had had their own falling out. In any event, Derouen was not paid in 1985 and, insofar as we can divine, is still owed some $70,750.00 as his "share" of the Gutierrez to H & D notes.
About this same time, December, 1985, Derouen and Murray sought the advice of Thomas Bryan, an accountant, regarding the status of things. During the years since the sale to Gutierrez, Derouen had personally paid the corporation's franchise taxes in order to keep it alive and in good standing and sought his share thereof from Murray. On December 28, 1985, Murray paid Derouen $5,100.00, and Derouen signed and delivered a handwritten release which reads as follows:
RELEASE
STATE OF MISSISSIPPI
COUNTY OF HARRISON
I Leroy Derouen do hereby acknowledge recpt of $5100.00 from H.L. Murray as payment in full for any and all debts between us as of this the 28th day of December 1985, for our business dealings dated December 9, 1982, to date.
 /s/ Leroy Derouen
 Leroy Derouen
December 28, 1985
Derouen received nothing further on the Gutierrez notes, and on October 13, 1986, he commenced this civil action by filing his complaint in the Chancery Court of Harrison County, Mississippi, First Judicial District. Derouen named Hudson F. Murray as the sole defendant and charged in outline form the facts described above and demanded of and from Murray
an accounting of all assets and monies coming into his hands in favor of H & D Seafood, Inc. and a declaration declaring and paying over to plaintiff a fifty percent *1090 interest in all said monies as dividends.
The complaint further charged that Murray had illegally cancelled the corporation's deed of trust covering the leasehold interest in the Small Craft Harbor premises and demanded reinstatement thereof. Finally, the complaint charged that Murray, acting through M & M Seafood, sold and otherwise improperly disposed of the former assets of H & D Seafood in his sale to Seafood and Ice, Inc., and demanded judgment for the considerations received.
The case was called for trial on November 28, 1988. The parties, the witnesses, and the proofs explored broadly into Murray's dealings with the former H & D properties and business. From the outset, however, the Chancery Court saw this as a simple suit by Derouen against Murray and that there was a serious question whether Derouen had sued the right defendant. In the end, the Court held that Derouen had, on December 28, 1985, released Murray "from any and all further obligations between them," and that
while the plaintiff [Derouen] may still have some cause of action remaining for the payment of the unpaid balance on this obligation [presumably against Gutierrez and/or M & M Seafood, Inc. and/or Seafood and Ice, Inc.], it is apparent to the Court that this cause of action does not lie against the defendant, Hudson L. Murray.
By order entered June 1, 1989, the Court finally dismissed Derouen's suit. This appeal has followed.

III.
Derouen charges error in the Chancery Court's holding that the December 28, 1985, release was an accord and satisfaction and operated to discharge Murray of all personal obligations to him. It appears the instrument was prepared in handwritten form by Accountant Thomas Bryan. Derouen says the document was more in the nature of a receipt for Murray's payment of his share of the corporation's franchise taxes which Derouen had been keeping up. The Court below heard all of this and held the document effective and that it speaks for itself. Upon inspection, we find it clear and unambiguous. There is no evidence of fraud, duress, or mistake or the like  certainly not evidence such that we might disturb the Court's implicit finding that the release is effective according to its tenor. We are also struck by the absence of clear and convincing parole evidence that the release means anything than what it provides. We find this point without merit.
Moreover, the Chancery Court may well have been correct that Derouen "may still have some cause of action remaining for the payment ..." against others. The facts certainly suggest a possible action against Gutierrez and/or M & M Seafood, Inc., and/or Seafood and Ice, Inc. Nothing said here should be taken to imply an opinion thereon, nor are we favored with information regarding the solvency of any of these three putative obligors or whether they may have other legal or practicable defenses.
For the moment, insofar as the Chancery Court held the December 28, 1985, release to bar any further personal action by Derouen against Murray, we affirm.

IV.
The release by its terms addresses "debts between us"  Derouen and Murray. It releases claims arising out of "our business dealings." We do not read this language to include claims the corporation, H & D, may have against Murray, even though Derouen as a shareholder, via dividends or otherwise, may ultimately benefit therefrom. Indeed, the essence of this action, first in Derouen's complaint, and more fully at trial, is the charge that Hudson L. Murray, as president and director of H & D Seafood, Inc., breached duties owed the corporation. Derouen has never called his action a "shareholder's derivative action," but looking to its nature, the proof he made and the relief he sought, that is exactly what it is. Derouen's suit is but a rose by another name, and we doubt there can be doubt of the point.
*1091 It bears emphasis that, first and foremost, a derivative action is an asset of the corporation, one, to be sure, that the corporation through its directors and officers may deal with as any other corporate asset. When, as here, Derouen charges Murray's breach of his fiduciary duty of fair dealing to the corporation, he charges a violation of Murray's duties to the corporation and only derivatively owed him. All of this is important for many reasons, principal of which is that the release Derouen gave Murray on December 28, 1985, has no effect on the derivative claim.
We are ten years past the point where a plaintiff's mislabeling of his complaint is fatal to his suit. Bruce v. Barnett, 587 So.2d 898, 902 (Miss. 1991); Shannon v. Henson, 499 So.2d 758, 762 (Miss. 1986); Moore v. Moore, 451 So.2d 226, 227 (Miss. 1984). Moreover, we find nothing remotely resembling an objection from Murray as Derouen explored at trial the various parameters of Murray's dealings with the former assets of H & D, beginning with the sale to Gutierrez and through and including the sale to Seafood and Ice, Inc. Derouen's derivative claim has been tried by implied consent. See Rule 15(b), Miss. R.Civ.P.; Weiss v. Weiss, 579 So.2d 539, 542 (Miss. 1991); Queen v. Queen, 551 So.2d 197, 200 (Miss. 1989); Rankin v. Brokman, 502 So.2d 644, 646 (Miss. 1987). To be sure, our law impresses upon derivative actions certain pre-trial procedural requisites over and above the norm.[2] Miss. Code Ann. § 79-4-7.40 (rev. 1989). We take these as waived as well.
On appeal, Derouen's point is that the Chancery Court ignored his claims that Murray had breached his duties owed to H & D Seafood and its other shareholder. In his complaint, Derouen insists Murray did this
by manipulating the corporation's assets and forming another corporation to take over H & D Seafood's business and making large profits therefrom, cancelling the valid deed of trust of H & D Seafood so that the security of H & D Seafood was completely abrogated... .
He offered colorable (though by no means conclusive) proof to support his charge. Derouen says in the end that the Chancery Court should have
voided the cancellation of the deed of trust, the business dealings of the defendant Murray through M & M Seafood with Lee P. Gutierrez and Seafood and Ice and in failing to require a complete accounting for the monies defendant Murray received as profits....
In reply, Murray argues Derouen is merely challenging findings of fact below. Murray invokes the familiar substantial evidence rule and argues on the proof one may not say the Court's findings were manifestly wrong or clearly erroneous. What Murray fails to see, and what ultimately sinks his judgment, in part, is that these limitations on our scope of review do not apply where the Court below has proceeded *1092 according to an erroneous view of the law. See, e.g., Morrow v. Morrow, 591 So.2d 829, 832 (Miss. 1991); Bean v. Broussard, 587 So.2d 908, 913 (Miss. 1991); Riddle v. State, 580 So.2d 1195, 1200 (Miss. 1991); McClendon v. State, 539 So.2d 1375, 1377 (Miss. 1989). This is but another way of saying that when passing upon points of law decided in a trial court, our review is de novo. See, e.g., Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990); Cole v. National Life Insurance Co., 549 So.2d 1301, 1303 (Miss. 1989). Here the charge is that on this claim the Court below did not apply the law at all.
We begin with some basics. Officers and directors have well defined duties owed to the corporation they serve and, equitably, to its shareholders. In the first place, an officer or director owes the corporation a duty of care, a duty to perform the officer's or director's functions in good faith, in a manner that he or she reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances.[3] Miss. Code Ann. §§ 79-4-8.30 and -8.42 (rev. 1989 and Supp. 1991).
Today's action concerns a different duty. It arises in that the officer or director stands in a fiduciary relationship to his corporation and shareholders. It imports proscriptions on conflicts of interest. We have called this the duty of loyalty and good faith in discharge of corporate office. Fought v. Morris, 543 So.2d 167, 171 (Miss. 1989); Ellzey v. Fyr-Pruf, Inc., 376 So.2d 1328, 1332 (Miss. 1979). Of late, it has been labeled "duty of fair dealing."[4] The duty extends first to the corporation. It may be brought to bear for the benefit of a shareholder where the defendant officer or director has used his position improperly to obtain a benefit for himself as a shareholder to the exclusion of other shareholders similarly situated. See Gibson v. Manuel, 534 So.2d 199 (Miss. 1988).
One important branch of the duty of fair dealing regards conduct when confronted with a corporate opportunity. One type of opportunity within this sub-species of the duty is
(1) any opportunity to engage in a business activity of which a director or senior executive becomes aware... of
(B) through the use of corporate information or property, if the resulting opportunity is one that the director or senior executive should reasonably be expected to believe would be of interest to the corporation.
Principles of Corporate Governance § 5.05(b)(1)(B). We have given further flesh to the rule in Hill v. Southeastern Floor Covering Company, Inc., 596 So.2d 874, 877-78 (Miss. 1992); and Ellzey v. Fyr-Pruf, Inc., 376 So.2d at 1332-35.
All of this suggests particular scrutiny of Murray's actions, when he learned Gutierrez wanted to sell the business in forming a new corporation, M & M Seafood, rather than in trying to reacquire the business for H & D. It refers also to Murray's participation in the sale to Seafood and Ice, Inc. These appear matters  opportunities  that may reasonably have been of interest to H & D. On the one hand, Derouen complains Murray's dealings may have impaired H & D's (and derivatively Derouen's) ability to collect the last two Gutierrez notes. On the other hand, he has sought to show Murray personally has profited handsomely. The point that bears emphasis is that at all times, Murray was president, director and fifty percent shareholder in H & D, and his first obligation lay to H & D. He was free to participate in other business transactions and interests only so long as he did so consistent with his prior duties to H & D, which, among others, included full and timely disclosure.
Perhaps there is more that ought be said. For the moment, what is apparent is that Derouen substantively pled and sought to *1093 prove that Murray breached his duty of fair dealing to H & D. Though not so labeled, this was and is a derivative action on behalf of the corporation against Murray. The Chancery Court did not regard it so. On this feature of the action, we may only reverse and remand to the Chancery Court for further such proceedings consistent, as it may deem appropriate, with this opinion and our law regarding the duties of corporate officers and directors and derivative actions by shareholders.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
NOTES
[1] The notes before us were issued and made payable to H & D Seafood Corporation. By the time of trial, the corporation had not been dissolved. Nothing before us reflects how or why Derouen acquired the right to direct receipt of a fifty percent share of the annual payments.
[2] For an elaborate exposition and commentary on the contemporary view of these procedural requisites, see American Law Institute, Principles of Corporate Governance: Analysis and Recommendations §§ 7.01, et seq., and Comments, Illustrations and Notes thereto (1992) (hereinafter Principles of Corporate Governance).

There is debate in other jurisdictions whether an action such as this may be brought as well as a direct action. See, e.g., Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379 (7th Cir.1990); Watson v. Button, 235 F.2d 235 (9th Cir.1956); Donahue v. Rodd Electrotype Company, 367 Mass. 578, 328 N.E.2d 505 (1975); Maki v. Estate of Ziehm, 55 A.D.2d 454, 391 N.Y.S.2d 705, 707 (3d Dept. 1977). We take the view of the Principles of Corporate Governance § 701(d):
(d) In the case of a closely held corporation ..., the [chancery] court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.
The principal effect of this course would be to exempt plaintiff from these procedural hoops. The Court below did not exercise its discretion regarding these matters, as it did not consider the derivative claims at all.
All of this refers but to the form and procedure for litigating certain substantive claims and, thus, in no way impugns our conclusion in Part III above.
[3] See Principles of Corporate Governance, §§ 4.01, et seq., and Comments, Illustrations, and Notes thereto.
[4] See Principles of Corporate Governance, Part V.